1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                            No. 1:08-cr-10309-MLW-1

4

5
    UNITED STATES OF AMERICA
6

7   vs.

8
    MICHELLE ROBINSON
9

10

11                        *********

12

13                    For hearing before:
                  Chief Judge Mark L. Wolf

14

15          Plea Change and Sentencing Hearing

16

17                    United States District Court
                  District of Massachusetts (Boston.)
18                    One Courthouse Way
                  Boston, Massachusetts 02210
19                    Friday, February 20, 2009

20

21                        ********

22

              REPORTER: RICHARD H. ROMANOW, RPR
23                  Official Court Reporter
                United States District Court
24      One Courthouse Way, Room 5200, Boston, MA 02210
                  bulldog@richromanow.com
25

```
1                    A P P E A R A N C E S

2

3    JAMES P. DOWDEN, ESQ.
     PAUL LEVENSON, ESQ.
4       United States Attorney's Office
        John Joseph Moakley Federal Courthouse
5       One Courthouse Way, Suite 9200
        Boston, MA 02210
6       (617) 748-3334
        Email: James.dowden@usdoj.gov
7       For the United States

8
     MARK D. SMITH, ESQ.
9       Laredo & Smith, LLP
        15 Broad Street, Suite 600
10      Boston, MA 02109
        (617) 367-7984
11      Email: Smith@laredosmith.com
        For the defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S
 2              (Begins, 2:30 p.m.)
 3              THE CLERK:  Criminal Matter 08-10309, United
 4    States versus Michelle Robinson.  The Court is in
 5    session.  You may be seated.
 6              THE COURT:  Good afternoon.  Would counsel
 7    please identify themselves for the Court and for the
 8    record.
 9              MR. DOWDEN:  Good afternoon, your Honor.
10    James Dowden on behalf of the United States and I'm
11    joined today with Paul Levenson, also, with the United
12    States.
13              THE COURT:  Mr. Dowden, you're going to have
14    to speak into the microphone and keep your voice up,
15    please.
16              MR. DOWDEN:  Thank you, your Honor.
17              MR. SMITH:  Good afternoon, your Honor.  Mark
18    Smith for Michelle Robinson.
19              THE COURT:  Since this is the first time I've
20    seen you, I'd like to try to assure that we have a clear
21    and common sense of where we are and where you hope to
22    go.
23         As I understand it, Miss Robinson was arrested on
24    August 13, 2008 and detained in Federal custody.  At
25    some point she represented that she was indigent, that
```

1    she had no income or assets, and Mr. Smith was appointed

2    as Criminal Justice Act counsel to represent her.

3    Although it's not quite clear to me how it took until

4    August 1, 2008 for her to be charged, on that date she

5    was charged in a one-count information alleging that she

6    used threats in interstate commerce in violation of 18

7    United States Code, Section 875D, and there are

8    forfeiture allegations pursuant to the relevant

9    statutory provisions.

10        On October 29, 2008, the grand jury returned a

11    three-count indictment asserting the 875D charge that

12    was in the information and adding two related charges of

13    wire fraud in violation of Section 1343.  The indictment

14    also has the forfeiture allegations in it.

15        On January 21, 2009, the defendant moved for the

16    preparation of a pre-plea presentence report.  I was

17    informed that the parties had entered into a binding

18    plea agreement on January 9, that is, an agreement

19    pursuant to Rule 11(c)(1)(C).  That's a kind of

20    agreement that I have to either accept and impose the

21    agreed-upon sentence or reject and give the defendant a

22    chance to withdraw her plea.  The binding plea agreement

23    provides for 6 months in custody, which I was told would

24    expire on February 13, 2009.  I was asked to conduct

25    this hearing before then.

1      The plea agreement would also require the

2   imposition of a 3-year term of supervised release with

3   the first 6 months in home detention.  This can be

4   clarified in the course of the proceeding, but I assume

5   that that could be home detention on electronic

6   monitoring, if appropriate.  In addition, it would

7   require, as a condition of supervised release, that Miss

8   Robinson not publicize the name of the victim of her

9   extortionate scheme.

10      The government, I was told, agreed with the

11   defendant that it was appropriate to proceed in this

12   fashion, so the day after the motion was filed on

13   January 22, I allowed it and I scheduled this hearing

14   for today, which appeared to be the earliest date that

15   Probation could prepare the presentence report and give

16   me and you a short period of time to study it intensely,

17   which I've done.

18      In my order, on January 22, I set a schedule for

19   the filing of any pretrial memos or other information

20   not in the presentence report, the contemplated filing

21   by February 6th.  No filings were made and two days ago

22   I ordered that sentencing memos be filed, at least by

23   the government.

24      Today I ordered that the financial statement of

25   the plea agreement provided would be given to the

1    government to be filed with me under seal.  I did that

2    because the defendant had not supplied a complete

3    financial statement to the Probation Office, rather she

4    referenced the fact that she would provide one to the

5    U.S. Attorney.

6        I wanted those filings so I could put myself in

7    the best position to make a properly-informed judgment

8    promptly, which is what you're asking me to do, and I

9    have studied everything very closely.  The memos were

10    filed.  The defendant objects to the calculation of the

11    presentence report.

12        The financial statement that I received this

13    morning from the government and some supplementary

14    information relating to the financial statement that was

15    given to Probation that the defendant filed, I put under

16    seal, because that's the type of information that

17    ordinarily comes in the presentence report and is

18    received under seal.  I expect we're going to be

19    discussing it.  I have questions rooted in the financial

20    statement reports.  The discussion will occur in open

21    court.

22        But -- and in addition, I guess I should note,

23    that within the hour Probation provided me, and I hope

24    already to you, a memo reviewing and revising the

25    calculations, or the guideline range essentially,

1    getting at the range advocated by the parties, although

2    by a different route, a 27 to 33 month range instead of

3    a 33 to 41 month range.

4        But in terms of the background and where we are at

5    the moment, is that a reasonable and reliable summary or

6    is there something else I should have in mind?

7            MR. DOWDEN:  Nothing else, your Honor, from

8    the Government.

9            MR. SMITH:  We would agree with that summary,

10   your Honor.

11           THE COURT:  Now, as I said, what I -- well,

12   actually I didn't say it.  There's a threshold issue

13   that needs to be addressed.

14       I did order this expedited preparation of the

15   presentence report, but Rule 32(e)(2) requires the

16   disclosure of a presentence report to the defendant 35

17   days before sentencing unless the defendant waives the

18   minimum period.  Rule 32(f)(1) requires objections be

19   filed 14 days after that and Rule 32(g) requires

20   disclosure of the report seven days before sentencing.

21   None of those things were done because the motion for

22   the pre-plea presentence report and the sentencing was

23   made less than 35 days before the requested sentencing

24   date.

25       So, Mr. Smith, I need to know whether Ms. Robinson

```
 1   wants to waive those time periods and, if so, I'll ask
 2   her a few questions.  If you want to describe what all
 3   of this means to her, why don't you take a minute or
 4   two.
 5               MR. SMITH:  It will just take a minute, your
 6   Honor.
 7               THE COURT:  Sure.
 8               (Pause.)
 9               MR. SMITH:  Thank you, your Honor.  I've
10   explained it to my client and she'll answer any
11   questions you have.
12               THE COURT:  All right.  Ms. Robinson, please
13   stand and be sworn.
14               (THE DEFENDANT, sworn.)
15               THE COURT:  You may be seated.
16               (Is seated.)
17               THE COURT:  Here, why don't you pull that
18   microphone up to try to assure that I can hear you.
19          Would you please state your true full name?
20               THE DEFENDANT:  Michelle Shanae Robinson.
21               THE COURT:  You're going to have to speak more
22   loudly.
23               THE DEFENDANT:  Michelle Shanae Robinson.
24               THE COURT:  Do you understand that you've just
25   taken an oath to answer the questions I'm going to ask
```

1    you truthfully?

2                  THE DEFENDANT:  Yes.

3                  THE COURT:  Do you know that -- with regard to

4    all the questions I'm going to ask you today, if you

5    give me a false answer, that could be a separate,

6    prosecutable criminal offense?

7                  THE DEFENDANT:  Yes.

8                  THE COURT:  Do you understand that if you're

9    confused by any of my questions or unsure about what an

10   honest and accurate answer would be, I'll give you a

11   chance to speak to Mr. Smith, so we can clear up any

12   confusion and you can give me a reliable response?

13                 THE DEFENDANT:  Yes.

14                 THE COURT:  All right.  Do you understand that

15   I've been told that you want to plead guilty and have me

16   sentence you today to the sentence that you and the

17   government agree to in the plea agreement?

18                 THE DEFENDANT:  Yes.

19                 THE COURT:  And do you understand that, among

20   other things, that sentence calls for 6 months in jail

21   or prison that may be a time period you've already

22   served?

23                 THE DEFENDANT:  Yes.

24                 THE COURT:  Do you understand that under the

25   rules a presentence report had to be prepared before I

1  could sentence you?

2          THE DEFENDANT:  Yes.

3          THE COURT:  And do you understand that I was

4  asked to have that presentence report prepared even

5  before you pled guilty on about January 21st of this

6  year?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Do you understand that under the

9  Federal Rules of Criminal Procedure ordinarily you have

10 a right to get that report 35 days before the sentencing

11 date and then there's a period of time for objections to

12 be made, for Probation to respond?

13         THE DEFENDANT:  Yes.

14         THE COURT:  And do you understand that you and

15 your attorney didn't get this report 35 days in advance,

16 you only got it a couple of days ago because that's when

17 it was prepared?

18         THE DEFENDANT:  Yes.

19         THE COURT:  And do you understand that usually

20 it takes about 12 weeks to go through the whole

21 presentence report process, but it was all done faster,

22 so if I'm persuaded to impose the sentence you and the

23 government agreed upon, you can get out sooner rather

24 than later?

25         THE DEFENDANT:  Yes.

1          THE COURT:  Have you talked with Mr. Smith

2     about whether you want to give up your right to have had

3     that presentence report 35 days in advance of the

4     sentencing?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Are you fully satisfied with his

7     work as your lawyer in this case?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And do you want to give up your

10    right to have that presentence report 30 days in advance

11    of the date I sentence you?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Well, I find that Ms. Robinson is

14    competent, that she's acting knowingly and voluntarily,

15    that she's effectively represented, therefore I accept

16    her waiver under Rule 32(e)(2).

17         Now, before we move to some other things, I want

18    to see if I accurately understand the key features of

19    the binding plea agreement, since to some extent I have

20    to question the defendant about it.

21         Since it's a binding plea agreement, what I intend

22    to do is conduct a Rule 11 colloquy.  At the end of that

23    I'll decide whether to accept the plea.  I will,

24    however, defer a decision on accepting the plea

25    agreement until after we have essentially the sentencing

1    hearing, which will follow the Rule 11 colloquy, and in

2    that sentencing hearing, I will decide whether to accept

3    the plea agreement and impose the agreed-upon sentence

4    or reject it and give Miss Robinson an opportunity to

5    withdraw her guilty plea, if I previously accepted it.

6         Do the parties agree that that's an appropriate

7    way to proceed?

8              MR. DOWDEN:  No objection from the Government,

9    your Honor.

10             MR. SMITH:  No objection, your Honor.

11             THE COURT:  Now, I do have some questions

12   about the plea agreement.  The plea agreement calls upon

13   me to dismiss Count 1, which is the alleged threat in

14   violation of Section 875(d).

15        What's the reason for dismissing Count 1?

16             MR. DOWDEN:  Your Honor, as we've outlined in

17   our sentencing memo with the Court, the Government

18   believed the totality of its recommended sentence,

19   including its provisions of supervised release --

20             THE COURT:  You're going to have to speak more

21   --

22             MR. DOWDEN:  Including its provisions of

23   supervised release, its period of incarceration, the

24   restitution, and the other provisions provide, in

25   totality, a reasonable sentence.  In coming to that

```
 1    reasonable sentence, the parties engaged in
 2    negotiations, plea negotiations, and as part of those
 3    negotiations, the Government agreed to dismiss Count 1
 4    and pursue Counts 2 and 3.
 5             THE COURT:  Did you think that that had some
 6    impact on the guideline range?
 7             MR. DOWDEN:  Your Honor, it certainly -- the
 8    Government does not -- does not believe that the wire
 9    fraud charges would have been different had it not
10    dismissed Count 1 of the indictment.
11             THE COURT:  But if Count 1 was in the
12    indictment, would the guidelines be higher?
13             MR. DOWDEN:  No, your Honor, the Government
14    does not believe as such.  And, also, the Government
15    believes that the wire fraud charges encapsulate the
16    core of the conduct found in Count 1, and that is part
17    of the reason why the Government agreed to dismiss Count
18    1.  It's part of the fraudulent scheme alleged in the
19    wire fraud counts, your Honor.  It was a scheme to
20    defraud by injuring the reputation of the addressee by
21    fraudulent misrepresentations.
22             THE COURT:  Because this is going so fast and
23    I'm trying to accommodate you, it's actually my sense
24    that if Count 1 -- and it may not be probation.  If
25    Count 1 remained in, it might be appropriate -- it would
```

1    be appropriate to use the higher loss amount, the 580

2    instead of the 280, which would have raised the

3    guideline range from 33 to 41.  But it's my present

4    sense, also, that that's not material.  It's an

5    overlapping range, 33 months is in that range, and the

6    departure or variance you're advocating is either going

7    to be reasonable under either of those ranges or not

8    reasonable, but the precise calculation is not material.

9             MR. DOWDEN:  Yes, your Honor, I agree with

10   that.  And as part of the parties plea agreement, there

11   was an agreement of the calculation of the guideline

12   sentence, and although probation has disagreed with it

13   on two occasions, I think they do now agree that

14   ultimately the calculation that -- that the range is the

15   same to get to the --

16            THE COURT:  Well, they agree that the range

17   for Counts 2 and 3 is as you calculated.  They may get

18   to it by a different route.  But I think the range might

19   be higher if Count 1 were still in.

20            MR. DOWDEN:  I agree, your Honor.  I do agree.

21            THE COURT:  Okay.  And then, as I said in the

22   order that I issued yesterday, as a condition of

23   supervised release, I'm being asked to order that Miss

24   Robinson not publicize the identity of the victim.  And

25   I don't issue orders I don't expect to be obeyed.  And I

```
1    don't issue orders that I think are ambiguous and might
2    arguably be reasonably misunderstood.  And to me, the
3    term "publicized," without some explanation or
4    clarification may be ambiguous.
5         As I said in the order that I issued yesterday, I
6    assume that I'm -- if I accept this agreement, that I am
7    to order Miss Robinson not to disclose the identity of
8    the victim in the future to anybody, except her attorney
9    and somebody working with him, anybody working with him
10   in connection with this case.  Is that what you
11   intended?
12            MR. DOWDEN:  Your Honor, as to the definition
13   of the term "publicize" in your order, the Government
14   agrees with your definition of "publicize" in this
15   context, yes.
16            THE COURT:  And, Mr. Smith, is that an
17   acceptable definition of "publicize" for the purpose of
18   this case?
19            MR. SMITH:  Yes, it is, your Honor.
20            THE COURT:  And then we'll discuss this
21   perhaps in more detail later.  But I put you on notice
22   yesterday that I was thinking -- and I'm concerned about
23   what happens if the victim's name gets revealed to the
24   media.  And I've ordered Miss Smith not to -- not Miss
25   Smith, Miss Robinson, not to disclose it.
```

1          There's a certain dynamic that I have some

2     familiarity with that usually ensues and the person

3     charged with the improper disclosure may well say,

4     "Well, a number of people knew this name and it wasn't

5     me who told the media."  And the Attorney General

6     usually doesn't authorize the Justice Department to

7     subpoena a member of the media to find his or her

8     source, so we look for the source here in court.

9          It would be helpful, I think, to perhaps avert any

10    problems in the future, but to put the Court in a

11    position to resolve the issues quickly and fairly since,

12    if that issue comes up, it could result in Miss Robinson

13    going to prison for three years and then being on

14    supervised release again.

15         If I learn, under seal, and I may not even bother

16    to look at it, it wouldn't affect any decision I'm

17    making now, who has that information as of today.  Does

18    the Government have a concern about my order?  Will the

19    Government let me know about that.

20              MR. DOWDEN:  Yes, your Honor.  My colleague,

21    Mr. Levenson, is going to address that point.

22              THE COURT:  Okay.

23              MR. LEVENSON:  Your Honor, I think we start

24    from common ground, which is that the Court's suggestion

25    is a good idea, and indeed our office has undertaken to

1    determine who within the chain of approvals within our

2    office has been exposed to the name of the victim, to

3    memorialize that information, gather it together, and

4    also to -- also to undertake to gather also from law

5    enforcement agents who may also have been exposed to

6    that information.

7         I think, as a prudential matter, whether the All

8    Writs Act or other authority extends to that, where we

9    agree that it's a good idea and we are representing to

10   the Court that we are undertaking to gather it, I think

11   Step 1 is accomplished, and that the question of -- I

12   think it is -- to the extent that there's a closed

13   question about the Court's authority now, if there isn't

14   a violation, at that point it seems to me that the Court

15   is well situated to say, "All right, now turn it over."

16        So what I think makes sense in the short term

17   rather than in -- and I spent some time last night and

18   today trying to read up on the All Writs Act and I came

19   away with two senses.  One, I'm not an authority on the

20   All Writs Act.  Two, I'm not sure anybody is.  It's

21   truly in unchartered waters.

22             THE COURT:  Well, the All Writs Act comes into

23   play only if you don't agree to give me the names.  And

24   let me tell you what gives me my concern and why I think

25   you ought to share thus far, given the Government's

1    interest in protecting the anonymity of the victim, um,

2    you succeeded and as far as I know it hasn't been

3    disclosed.  But you've done better so far than others.

4        About a year ago, the Department of Justice made a

5    decision not to charge Elliot Spitzer and to call him

6    "Client Number 9" in filings that were made with the

7    Court derived from wiretap information.  If you read the

8    New York Times, for example, March 10, 2008 and March

9    11, 2008, the New York Times reports that law

10   enforcement officials were among those who didn't follow

11   the decisions made by the Attorney General or his

12   designee in not indicting or naming Governor Spitzer,

13   they just put the information up.  In that case, that

14   may have been a crime because 18 United States Code

15   Section 2511(1)(d)(1) prohibits, makes it a crime,

16   punishable by five years in prison, to disclose

17   information derived from a wiretap without a court

18   order.

19       To my knowledge, the Department of Justice didn't

20   investigate that.  You don't want to -- you don't want

21   that to happen.  And, you know, I think I have the

22   authority under the All Writs Act, but I've been reading

23   about Miss Robinson in this case.  I haven't been

24   studying the All Writs Act since this occurred to me

25   yesterday.  But given your interest, I think (A) it

1    would be -- it would serve those interests if I had

2    those names, and if you agreed, I should just order that

3    the people who now have the information not disclose it

4    except to use it in the course of some -- you know, in

5    the course of their work.  They may do some ongoing

6    investigation.  I hope you will.  Because then if one of

7    your colleagues does something that you don't want them

8    to do, that will be a criminal contempt and they'll face

9    the same kind of penalties that Miss Robinson faces if

10   she violates my orders, the conditions of her supervised

11   release.

12        So given the fact that the U.S. Attorney's Office

13   has ardently arguing that confidentiality is important

14   and given the fact that in cases before me and in even

15   more prominent cases before other judges, that

16   nevertheless law enforcement officials have leaked

17   things they're not supposed to leak, I would think you'd

18   like that kind of order.

19            MR. LEVENSON:  I think we start from the

20   common ground in terms of the prophylactic effort of

21   identifying it.  I think there is a difference that I

22   think is important to consider here, a couple of

23   differences that inform my recommendation of what

24   amounts to a sentence, in some respects a half measure,

25   which is to say, gather the information so that in the

1    event of a question about whether Miss Robinson has

2    violated the terms of her probation, we are in a

3    position to engage in a meaningful inquiry informed by

4    prospectively-gathered information rather than the

5    scramble for -- the retrospective scramble.  There we're

6    at common ground.

7          The concern I have, um, and I have a couple of

8    concerns, both prudential as well as juris prudential,

9    if you will.  The juris prudential one is -- is what I

10   see as a difficult question at best as to whether the

11   All Writs Act authorizes orders to third parties at

12   large.  And in particular --

13          THE COURT:  Well, no, actually I've thought

14   about this, too.  You're not a third party.  You're a

15   party.

16          MR. LEVENSON:  Yes, the Government is a party

17   to this action.

18          THE COURT:  I think there are limits to how

19   far the order can go with regard to Miss Robinson, but I

20   assume Mr. Smith's going to represent Miss Robinson.  Go

21   ahead.

22          MR. LEVENSON:  Okay.  And I have to say that

23   had played into my thinking of, the reality of -- the

24   interest that -- um, if I can bring in another point of

25   reference.  I don't mean to be muddying the issue, but I

 1    think it's a very difficult issue with no clear

 2    guidance, so I'm looking for a couple of principles.

 3    And one point of reference was this Court's decision in

 4    connection with the earlier motion by the Press for

 5    access to the name, and the question of can the Press

 6    force the Government to turn over the name?  Which

 7    raises the fact that we're dealing here with information

 8    that, on the one hand, is private, the private acts of a

 9    private individual who is obviously ashamed of shameful

10    conduct, and on the other hand, there is the

11    Government's interest in prosecuting the perpetrator of

12    an extortion, which is a different issue from protecting

13    -- there's no general right of an individual to be

14    protected from scrutiny at large.

15              THE COURT:  Well, actually let me -- we've got

16    a lot to do and I actually have an important limitation

17    on my time this afternoon.  We're going to be finished

18    by today.  You know, there may be a hybrid and we can

19    come back to it.  (A) I think if you gave me the

20    information under seal, I wouldn't be making a decision

21    based on it now and therefore I doubt I would be

22    persuaded to unseal it, so the media would have more

23    people they could go ask for it.  But if you want to

24    represent that you've collected all that information,

25    that you'll hold it, maybe I don't even need it now,

1    because unless there's an alleged violation, I don't

2    need to know the universe of people who have the

3    information.  But I could order that the people listed

4    on the document that the U.S. Attorney is holding not

5    disclose it except to people who need to know it to

6    perform their professional responsibilities.  And then

7    if there's ever an issue, you'll deliver it to me and

8    I'll decide if any of those people are in contempt of my

9    order.

10            MR. LEVENSON:  I think the source of authority

11   is a little different here where there's no criminal

12   prescription on it and I think there are probably is a

13   source of authority for an order along those lines in

14   the Victim Protection Act.  So that may be the vehicle,

15   rather than the All Writs Act, for getting there.

16            THE COURT:  Well, that's why I raised it.  And

17   if -- you know, would you object to such an order?  You

18   keep the names.

19            MR. LEVENSON:  Yeah, I don't think that's an

20   unreasonable order.

21            THE COURT:  In fact, it is consistent with

22   what you're arguing about the All Writs Act.  Because,

23   as I say, so far you've done it, and that's why I've got

24   the issues that I have, but despite the best efforts of

25   some people, as the Spitzer case prominently suggests,

```
1    sometimes there are Government leaks.  And I just think
2    there ought to be sanctions across the board for anybody
3    who does what you don't want done.
4         Okay.  Now, with regard to --
5         MR. LEVENSON:  I'm not sure I can -- I don't
6    mean to tendentious on this point and I know you want to
7    move on.  I'm not sure I can go all the way from saying
8    that an extortionist who is prevented from inflicting
9    the harm that she threatened is in the same position as
10   government officials who ought to follow the law, ought
11   to respect the Victim Witness Act, but are not --
12   there's no sign of a violation now and they are already
13   required to follow the law and to respect the law.
14        THE COURT:  And what's going to happen if they
15   don't, are you going to send them to the office of
16   professional responsibility?  I mean, there should be --
17        MR. LEVENSON:  I don't know the answer now.
18        THE COURT:  There should be a sanction.  But
19   all right.
20        MR. LEVENSON:  So deciding that sanction now
21   -- the only point is, deciding that sanction now may not
22   be our best course.
23        THE COURT:  All right.  And if, you know,
24   somebody -- if I enter the order, particularly with your
25   agreement, and it turns out that somebody violated the
```

1    order, there are ways of challenging the lawfulness of

2    the order.  But you don't want this ever to become an

3    issue and neither do I.  I just want people to be on

4    clear notice that they're subject to some restrictions

5    and that they'll be consequences if they violate it.

6         Okay.  And, Mr. Smith, you know, Miss Robinson is

7    in a different position.  I think it would be very much

8    in her interest if I knew, now or sooner, or if you

9    knew, now or sooner, and had a document that I could

10    order you to produce if it ever becomes an issue as to

11    who has this information as of today, because that would

12    be the universe of people -- well, who has the

13    information as of today?

14              MR. SMITH:  Well, I know my client wants to

15    comply with that request, your Honor, and, again, I only

16    represent Miss Robinson and I can't speak for other

17    individuals or other people.  And I just want to

18    acknowledge that I think she's going to comply with that

19    order to the best of her ability and her memory,

20    understanding that she's been in jail for six months.

21              THE COURT:  All right.  And we'll come back to

22    this later, if we get to the sentencing phase, which I

23    hope we will, and you hope we will.  But the orders

24    wouldn't be entirely symmetrical.  I have to issue the

25    order to her, but the condition, if I impose it, will

1    say that she can't publicize, meaning disclose it to

2    anybody.  You know, if she were to say it to one of her

3    relatives and the relative said it to the Boston Globe,

4    she would be in violation of the condition because she

5    told her relative, even though she's not the one who

6    told the Boston Globe.  If there are already some people

7    out there who know the name, it would help her argue,

8    should this ever become an issue, "I didn't, after the

9    day I was sentenced, tell him or her."

10              MR. SMITH:  Arguably, the longer the list, the

11   more protection she'd have in some way.  Is that --

12              THE COURT:  Well, yeah.  Look, I've conducted

13   leak investigations and it's hard to do.  If this name

14   gets out and she didn't -- and you want to persuade me

15   that she didn't put it out, it's going to help you to be

16   able to argue that she wasn't the only one who knew it,

17   and the more people who knew it, the better chance you

18   may have of keeping her out of prison as long as her

19   defense is truthful.

20              MR. SMITH:  I understand.

21              THE COURT:  We'll come back to this.

22              MR. SMITH:  Thank you.

23              THE COURT:  But actually I think I need to put

24   the question to you this way and it's part of the reason

25   I raise it now and not just later, because I can't add

1    terms to the sentence unless you all agree with it.  I

2    can reject it, but I cannot -- so what you need to tell

3    me, or if necessary think about, is whether this term

4    would be mutually acceptable.

5              MR. SMITH:  Between the Government and the

6    defense?

7              THE COURT:  No.  No, whether -- well, yeah,

8    whether --

9              MR. SMITH:  We would accept it, your Honor.

10   My client would accept it, your Honor.

11             THE COURT:  All right.  And although they

12   wouldn't be framed exactly the same way.  It's not part

13   of the sentence with regard to the Government, it's an

14   ancillary order, which is what the All Writs Act

15   ordinarily covers.

16        Okay.  And then the plea agreement has a waiver of

17   right to appeal in Paragraph 7.  So if Mr. Smith, I'll

18   eventually be asking you whether you've talked with the

19   defendant about that.  It has a forfeiture provision.

20        Is there anything else I should have in mind with

21   regard to the plea agreement?

22             MR. DOWDEN:  The only other thing, your Honor,

23   is, as you mentioned, it calls for the Government to

24   dismiss Count 1 of the indictment and she would plead to

25   Counts 2 and 3.

1           THE COURT:  And you also are going to want me

2     to dismiss the information?

3           MR. DOWDEN:  Yes, to the extent it's not

4     already dismissed.  Yes, sir.

5           THE COURT:  All right.  Under the relatively

6     -- well, under the Crime Victim's Rights Act, the CVRA,

7     and the relatively new Federal Rule of Criminal

8     Procedure 60, the victim has a right to attend any

9     hearing involving a plea or a sentencing, among other

10    things, and a right to be heard, either personally or

11    through a representative or through the Government.  Was

12    the victim notified of this proceeding?

13          MR. DOWDEN:  Yes, your Honor, a victim letter

14    was sent out in the ordinary course, as the Government

15    usually does, and I understand that counsel for the

16    victim is in the courtroom today.

17          THE COURT:  All right.  And do you know

18    whether he wishes to be heard with regard to the plea or

19    the sentence?

20          MR. DOWDEN:  I think he's reserving his right

21    to be heard, your Honor.  I don't know if he --

22          THE COURT:  Well, perhaps he could identify

23    himself if he's here.

24          MR. STERN:  Good afternoon, your Honor.  My

25    name is Donald K. Stern with the law firm of Cooley,

1    Godward and Kronish, and I do represent the victim in

2    this case.

3              THE COURT:  Okay.  And does your client,

4    directly or do you on his behalf, want to be heard with

5    regard to the plea or the sentence at an appropriate

6    time?

7              MR. STERN:  Yes, or at least depending upon

8    how it progresses, I would like to -- I may want to say

9    something before your Honor makes a decision.

10             THE COURT:  Well, let me ask you this.

11             MR. STERN:  Whatever time you think is

12    appropriate.

13             THE COURT:  Well, there's essentially two

14    points.  The first thing I'm going to do is go through

15    the usual Rule 11 colloquy with regard to Miss Robinson

16    and decide whether to accept the plea, but not the plea

17    agreement and the sentence.  Do you want to be heard

18    before I do that Rule 11 colloquy?

19             MR. STERN:  No, your Honor.

20             THE COURT:  Then ordinarily I would give the

21    victim a chance to speak before I hear from the

22    government and the defendant about the appropriate

23    sentence, or in this case, whether to accept it.  There

24    may be an opportunity for some flexibility here.  But

25    when we get to that point, I'll ask you again, if you

```
 1   want to be heard.

 2            MR. STERN:  That's fine, your Honor.  The

 3   victim does support the plea agreement, just to get to

 4   the bottom line, and I can make those comments at

 5   whatever point in the procedure is appropriate.

 6            THE COURT:  Okay.  A little later.

 7        All right.  Miss Robinson should approach the

 8   witness stand.  She's already been sworn.  And,

 9   Mr. Smith, ideally you would go with her with a copy of

10   the plea agreement and the indictment.

11            MR. SMITH:  I have those, your Honor.

12            THE COURT:  Would you, again -- do you

13   understand that you're still under oath?

14            THE DEFENDANT:  Yes.

15            THE COURT:  Do you understand, again, that if

16   you intentionally give me a false answer to any

17   question, that could be a separate prosecutable criminal

18   offense?

19            THE DEFENDANT:  Yes.

20            THE COURT:  And do you understand that if

21   you're confused by any of my questions or unsure about

22   what an honest or accurate answer would be, I'll let you

23   talk to Mr. Smith so we can clear up any confusion and

24   so you can give me a reliable response?

25            THE DEFENDANT:  Yes.
```

1          THE COURT:  Have you ever been arrested or

2    convicted under any name other than the name you gave me

3    a short time ago?

4          THE DEFENDANT:  Yes.

5          THE COURT:  What other name or names have you

6    been arrested or convicted under?

7          THE DEFENDANT:  Um, Michelle Wilkinson.

8          THE COURT:  How old are you?

9          THE DEFENDANT:  Um --

10          THE COURT:  I'm sorry.  Mr. Smith, is there

11    something you want to discuss with her?

12          THE DEFENDANT:  Um, and Michelle Garcia.  I

13    have filed for divorce and I wanted to go over to my

14    mother's maiden name.  I've been notified -- I was

15    arrested under Michelle Garcia, but I'm legally now

16    Michelle Garcia.

17          THE COURT:  Okay.  Pull that microphone a

18    little closer to you.  Try to speak into it clearly and

19    loudly.  How old are you?

20          THE DEFENDANT:  29.

21          THE COURT:  How far did you go in school?

22          THE DEFENDANT:  Some college.  Finished high

23    school.

24          THE COURT:  Have you ever been treated for

25    mental illness or drug addiction?

```
1              THE DEFENDANT:  No.

2              THE COURT:  Are you today under the influence

3    of any drug, medication or alcohol?

4              THE DEFENDANT:  No.

5              THE COURT:  Have you received a copy of the

6    indictment with three charges against you including two

7    that charge you with wire fraud?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Did you read that?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Did you discuss the charges with

12   Mr. Smith including what the Government would have to

13   prove beyond a reasonable doubt to convict you of the

14   wire fraud charges?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Are you fully satisfied with

17   Mr. Smith's work as your lawyer?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Do you have a copy of the letter

20   dated January 6, 2009 to Mr. Smith from the Government?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Did you sign that -- we'll make

23   that Exhibit 1 with today's date.

24        Did you sign that letter on the last page on or

25   about January 9, 2009?
```

1          THE DEFENDANT:  Yes.

2          THE COURT:  Did you read it before you signed

3    it?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Did you discuss it with Mr. Smith

6    before you signed it?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Does that letter both accurately

9    and completely describe your agreement with the

10   government?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Has anybody made any promises to

13   you or given you any assurances that are not in that

14   letter?

15         THE DEFENDANT:  No.

16         THE COURT:  Has anybody threatened you or

17   tried to force you to plead guilty?

18         THE DEFENDANT:  No.

19         THE COURT:  Do you understand that this is

20   what's called a binding plea agreement and, therefore,

21   if I accept the agreement, I have to impose the sentence

22   that's described in the letter, and if I don't accept

23   the agreement, I have to tell you I'm not going to

24   impose that sentence and give you a chance to withdraw

25   your plea?

1            THE DEFENDANT:  Yes.

2            THE COURT:  Do you understand that if I accept

3    the plea agreement I will sentence you to six months

4    incarceration, to be followed by six months in home

5    detention, as part of three years of supervised release,

6    restitution of $280,000, forfeiture as set forth in the

7    plea agreement, and a $200 mandatory special

8    assessment?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Do you understand that one of the

11   conditions of your supervised release will be that you

12   cannot tell anybody, except your lawyer and people

13   working with him, the name of the victim or the identity

14   of the victim?

15           THE DEFENDANT:  Yes.

16           THE COURT:  And do you understand that if you

17   were to disclose the victim's identity, that would be a

18   violation of that condition of your supervised release,

19   your supervised release could be revoked, you could be

20   locked up for up to three years, and then put on

21   supervised release again?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Do you understand that -- I've

24   been told that, in addition to what you agreed in the

25   letter, by Mr. Smith, that you were also agreeable to

```
 1    giving him, and if I order it, me, the names of all the
 2    people you've, up until now, told the victim's
 3    identity?
 4              THE DEFENDANT:  Yes.
 5              THE COURT:  And you can talk about this with
 6    Mr. Smith if you want.  And is that acceptable to you?
 7              THE DEFENDANT:  Yes, it is.
 8              THE COURT:  Please go over to Page 4 of that
 9    plea agreement.  Do you see Paragraph 7 there?
10              THE DEFENDANT:  Yes.
11              THE COURT:  Do you understand that in that
12    Paragraph 7 you're giving up your rights to appeal and
13    to otherwise challenge anything in this case if I give
14    you the sentence that you agree to in this plea
15    agreement plus the additional condition of disclosing
16    the names of people who already know the victim's
17    identity that I just mentioned?
18              THE DEFENDANT:  Yes.
19              THE COURT:  And have you discussed with
20    Mr. Smith specifically whether you want to give up those
21    rights?
22              THE DEFENDANT:  Yes.
23              THE COURT:  And is that something you want to
24    do?
25              THE DEFENDANT:  Yes.
```

1          THE COURT:  Do you understand that if I accept

2    your plea of guilty, you'll become a Federal felon and

3    you may lose certain rights, if you have them, including

4    the right to vote, to hold public office, to serve on a

5    jury, and to possess a firearm?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Do you understand that the maximum

8    possible penalties are as stated in Paragraph 2 of the

9    plea agreement, that is, on each of the two counts of

10   wire fraud, you could be sentenced to up to 20 years in

11   prison, plus 3 years supervised release, a fine of

12   $250,000, and a mandatory $100 special assessment?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Do you understand that supervised

15   release means that when you get out of jail or prison

16   you'll be under the supervision of the Probation

17   Department on certain conditions, and if you violate any

18   of those conditions, your supervised release can be

19   revoked and you can be locked up again for up to three

20   years?

21         THE DEFENDANT:  Yes.

22         THE COURT:  And then put on supervised release

23   again?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Do you understand that the

1    sentencing in this case will be governed by the Advisory

2    Guideline System that is now in effect in Federal

3    court?

4            THE DEFENDANT:  Yes.

5            THE COURT:  Have you talked with Mr. Smith

6    about how that Advisory Guideline System might operate

7    or apply in your case?

8            THE DEFENDANT:  Yes.

9            THE COURT:  And do you understand that under

10   that system essentially I'm required to calculate a

11   guideline range, and in this case, because there's an

12   agreed sentence, either decide that the agreed sentence

13   is reasonable or reject the plea and give -- the plea

14   agreement and give you a chance to withdraw your guilty

15   plea?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Do you understand that while

18   you've given up your rights to appeal, if I accept the

19   agreed upon sentence, the Government still has a right

20   to appeal?

21           THE DEFENDANT:  Yes.

22           THE COURT:  Do you understand that there's no

23   parole in the Federal system so you'll have to serve

24   essentially all of the time in jail that's imposed?

25           THE DEFENDANT:  Yes.

1          THE COURT:  Do you understand that you still

2    have a right, if you want to use it, to have a trial

3    decided by a jury?

4          THE DEFENDANT:  Yes.

5          THE COURT:  And do you understand that in

6    connection with a trial, you have a right to a lawyer,

7    and if you can't afford a lawyer, a lawyer will be

8    appointed to continue to represent you at public

9    expense?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Do you understand that if we had a

12    trial, you would be presumed innocent, you would not

13    have to prove you were innocent, rather the government

14    would have to prove you were guilty beyond a reasonable

15    doubt to achieve your conviction?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Do you understand that if we had a

18    trial, you would have an opportunity, through your

19    lawyer, to object to the Government's evidence and

20    challenge its witnesses?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Do you understand that as part of

23    that -- no.  Do you understand that you would also have

24    an opportunity, but not an obligation, to present a

25    defense including compelling the attendance of witnesses

1   to testify and the production of documents?

2                THE DEFENDANT:  Yes.

3                THE COURT:  Do you understand that you would

4   also have an opportunity, but not an obligation, to

5   testify yourself and if I instructed you -- well, if you

6   decided not to testify, I would instruct the jury that

7   it could draw no suggestion that you were guilty from

8   your decision not to testify?

9                THE DEFENDANT:  Yes.

10               THE COURT:  Do you understand that if I accept

11  your guilty plea and then accept the plea agreement,

12  you'll be giving up your right to a trial and there will

13  be no trial?

14               THE DEFENDANT:  Yes.

15               THE COURT:  All right.  Do you have a copy of

16  the indictment there?

17               MR. SMITH:  Yes, I do, your Honor.

18               THE COURT:  Miss Robinson, did you, indeed,

19  read all of this indictment?

20               THE DEFENDANT:  Yes.

21               THE COURT:  I'll like you to keep all of it in

22  mind, but I'm going to focus on Counts 2 and 3, the wire

23  fraud counts, the alleged violations of 18 United States

24  Code Section 1343.  Do you understand that to prove each

25  of the charges in Counts 2 and 3, the Government would

have to prove beyond a reasonable doubt, first, a scheme substantially as charged in the indictment to defraud or to obtain money or property by means of false or fraudulent pretenses; two, that you knowingly, meaning intentionally, and willfully, knowing it was illegal, participated in the scheme with intent to defraud; and third, interstate wire communications on or about the date alleged occurred in furtherance of the scheme?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand that interstate wire communications include wire transfers of funds between financial institutions?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand that a "scheme" is some plan or course of action, and to "defraud" means to deceive somebody else to get money by misrepresenting some material fact?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand that a material fact is one that has a tendency to influence the person it is directed at?

THE DEFENDANT:  Yes.

THE COURT:  Now, Counts 2 and 3 charge as follows, starting at Paragraph 17.  It says:  "On or about the date set forth below in the District of

1    Massachusetts and elsewhere, you, Michelle Robinson,

2    having devised and intending to devise a scheme to

3    defraud and for obtaining money and property by means of

4    false and fraudulent pretenses, representations and

5    promises concerning material facts for the purpose of

6    executing such scheme and artifice did transmit," and

7    here it says "and," but it really means "or," "or cause

8    to be transmitted by means of wire communication in

9    interstate commerce, from one state to another, the

10   following:"

11         Count 2 charges that on or about July 24, 2008, as

12   part of your scheme, you caused the transfer of $80,000

13   from the Mellon Bank to another branch of the Mellon

14   Bank.  Did you commit that crime?

15              THE DEFENDANT:  Yes.

16              THE COURT:  Count 3 charges that on the same

17   date, or on or about that date, you also caused the

18   transfer of $200,000 from the Mellon Bank to the Bank of

19   America.  Did you commit that crime?

20              THE DEFENDANT:  Yes.

21              THE COURT:  Now, I'd like you to listen while

22   the government summarizes what its evidence would have

23   been if this case went to trial, and then I'm going to

24   ask you if you agree with the government's summary of

25   what you did.

1          MR. DOWDEN:  Thank you, your Honor.

2      If this case were to proceed to trial, the

3   government to prove the following.

4      Over some period of time, beginning no later than

5   2007, the defendant, Michelle Robinson, entered a

6   consentual sexual relationship with BP, a married

7   business person.  BP is not an elected official, nor a

8   public official.

9      At some point during her relationship with BP,

10  Robinson recognized that BP was a successful business

11  person who had substantial monetary assets and further

12  recognized that public exposure of her relationship to

13  him would subject him to reputational harm.

14      Beginning no later than July 22, 2008, Robinson

15  concocted a scheme to extort money from BP by

16  threatening to expose her relationship with him to a

17  third-party, including to an individual she referred to

18  as a member of the media, who she claimed offered her

19  money to reveal her relationship with BP.  As Robinson

20  well knew, however, there was no such third-party who

21  offered her money to reveal such relationship.

22      In particular, Robinson sent a series of

23  threatening communications to BP in which she demanded

24  money or she would expose BP.  In response to Robinson's

25  demand, BP initially paid her $80,000 in cash.  In order

1   to obtain and replenish the funds necessary to obtain

2   this cash, there was an interstate wire of monies from

3   accounts maintained by BP that was transmitted on or

4   about July 24th, 2008.

5        After receiving the $80,000 in cash, Robinson

6   demanded more money from BP and threatened to reveal him

7   to a member of the media she claimed was interested in

8   this information.  BP paid her $200,000 in cash in

9   response to those demands.  Again, to obtain the funds

10  necessary to make this payment, an interstate wire

11  transfer of funds was executed on or about July 24th,

12  2008.

13       The Government's evidence at trial would include

14  bank records, phone records, recorded telephone

15  conversations and text messages as well as testimony

16  from both civilian and law enforcement witnesses.

17       Thank you, your Honor.

18            THE COURT:  Do you agree with the Government's

19  summary of what you did?

20            THE DEFENDANT:  Yes.

21            THE COURT:  And how do you now wish to plead

22  to Counts 2 and 3, guilty or not guilty?

23            THE DEFENDANT:  Guilty.

24            THE COURT:  Then I'll -- do you want to say

25  something?

1              MR. DOWDEN:  Yes, your Honor.  I don't believe

2      the defendant was advised of the statutory maximums and

3      if the Court would like to --

4              THE COURT:  Yes, she was, I read her Paragraph

5      2 of the plea agreement.

6              MR. DOWDEN:  Oh, I apologize then, your Honor.

7              THE COURT:  Do you remember I read you

8      Paragraph 2 of the plea agreement that recited the

9      maximum possible penalties?

10             THE DEFENDANT:  20 years to life.

11             MR. DOWDEN:  Thank you, your Honor.  I

12     apologize.

13             THE COURT:  Well, I am accepting the plea, but

14     making no decision at this moment on the plea

15     agreement.  I'm doing that, accepting the plea, because

16     I find you are competent, you are acting knowingly and

17     voluntarily, you are effectively represented, and

18     there's an independent basis in fact to support your

19     plea.  You may take your seat back at the table.

20             (Takes seat at table.)

21             THE COURT:  Now we will move to the sentencing

22     phase of this proceeding.

23         In connection with the sentencing, I have the

24     presentence report, the financial statement that the

25     defendant gave to Probation, and today's February 20,

1    2009 memo from Probation with copies to the parties,

2    which I'll make part of the presentence report.  It

3    revises the calculation.  I also have the Government's

4    sentencing memo, the defendant's sentencing memo, the

5    financial affidavit provided to the Government pursuant

6    to the plea agreement, which I have placed under seal.

7    The defendant's submission today provided some

8    additional information concerning the financial

9    statement that was given to probation.

10        I've looked at the -- let's see.  I think that's

11    it.  Is there anything else I should have received and

12    read relating to sentencing?

13        MR. DOWDEN:  Nothing further from the

14    Government, your Honor.

15        MR. SMITH:  No, your Honor.  Although, we did

16    incorporate in the letter we sent this morning, I

17    believe, a statement regarding somebody staying at the

18    house that we propose she reside at.  Probation had a

19    concern.  We addressed that concern by voluntarily

20    requesting that person to move out and Probation appears

21    satisfied.  I think we wrote that in a letter to the

22    Court.

23        THE COURT:  Actually.  (Looks.)

24        MR. SMITH:  That should have come with the

25    financial statement, as the cover page of the financial

1    statement that we submitted this morning, your Honor.

2            THE COURT:  Oh, okay.  Yes.  That's under

3    seal.  It's my understanding that if there's an

4    operative telephone, Probation is content to have Miss

5    Robinson reside at that address if I accept the binding

6    plea agreement.

7        All right.  Then, I think it's important to assure

8    that there's a clear and common sense of the legal

9    landscape here.  We are under the Advisory Guideline

10   System that is in effect after the Supreme Court's

11   decisions in **Kimbrough** and **Gall.**  As the Supreme Court

12   described in **Gall:**  "A court, a District Court should

13   begin all sentencing proceedings by correctly

14   calculating the applicable guideline range.  The

15   guidelines should be the starting point and the initial

16   benchmark.  The guidelines are not the only

17   consideration, however.  Accordingly, after giving both

18   parties an opportunity to argue for whatever sentence

19   they deem appropriate, the District Judge should then

20   consider all of the Section 3553A factors to determine

21   whether they support the sentence requested by a party.

22   In so doing, he may not presume that the guideline range

23   is reasonable, he must make an individualized assessment

24   based on the facts presented.  If he decides that an

25   outside guideline sentence is warranted, he must

1    consider the extent of the deviation and ensure the

2    justification is sufficiently compelling to support the

3    degree of the variance."  The Supreme Court said and

4    found it uncontroversial that "a major departure should

5    be supported by a more significant justification than a

6    minor one.  After settling on the appropriate sentence,

7    the judge must adequately explain the chosen sentence to

8    allow for meaningful appellate review and to promote the

9    perception of fair sentencing."

10          Do the parties agree that that's the general

11   framework?

12               MR. DOWDEN:  Yes, your Honor.

13               MR. SMITH:  Yes, your Honor.

14               THE COURT:  We are operating under the current

15   guideline manual.  This is a binding plea agreement.

16   It's my understanding, under 6(b)(1.2)(c), that to the

17   extent the lower the guideline sentence is regarded as a

18   departure, I have to decide if the sentence departs for

19   justifiable reasons.  And the commentary points me to

20   Section 3553B to determine if there are justifiable

21   reasons.  Essentially I have to determine whether this

22   case is of a kind -- was outside the heartland that

23   involves something in kind or degree that wasn't taken

24   into account by the Sentencing Commission when it

25   developed the guidelines.

1          Post **Booker** I think I'm directed to make that

2     analysis under Section 3553A, to consider those factors

3     and decide whether the sentence is justified.  I guess

4     I'm still in the frame of mind that I was in in 1994

5     when I had a binding plea agreement in the **C.R. Bard**

6     **case**, 848 F. Supp. 287 at 288.  Essentially it's my view

7     that if the agreed sentence is the result of arm's

8     length bargaining between capable counsel, I should

9     accept it if it's within the range of reason.  The

10    burden of proof is on the parties to persuade me that a

11    lower than guideline sentence is justified, is

12    reasonable, based on the Section 3553A factors.  That

13    was discussed somewhat by the court in Nebraska and

14    **Coney**, 390 F. Supp. 2nd 844 at 850.

15         But essentially it's my present view that I should

16    accept the binding plea agreement and impose the agreed-

17    upon sentence if it's within the range of what I regard

18    as reasonable and I consider the Section 3553A factors

19    even if it isn't the exact sentence I would select in

20    the absence of a binding plea agreement.

21         Does somebody have a different view of what

22    standard I should apply?

23              MR. DOWDEN:  No, your Honor.

24              MR. SMITH:  No, your Honor.

25              THE COURT:  Mr. Smith, let me ask you then.

1  Have you and Miss Robinson each read the presentence

2  report?

3            MR. SMITH:  Yes, we have, your Honor.

4            THE COURT:  Is there anything in there that

5  you or she thinks is inaccurate?

6            MR. SMITH:  No.  Our plea agreement, we

7  conceded that this is a Level 21 offense.  With the

8  revised plea agreement, it comes back with the same

9  number, so we would agree with that.

10            THE COURT:  Okay.  Miss Robinson, did you read

11  the presentence report?

12            THE DEFENDANT:  Yes.

13            THE COURT:  Is there anything you saw in there

14  that you think is inaccurate?

15            THE DEFENDANT:  No.

16            THE COURT:  Then -- there was a difference in

17  the guideline calculations between the plea agreement

18  and the presentence report.  The parties calculate the

19  guidelines as 27 to 33 months.  Implicit in that is that

20  they believe this is a level -- a Level 18, Criminal

21  History category 1.  I think the parties used Section

22  2(B)(1.1), an intended loss of $580,000, to get to

23  that.  The presentence report had this at a Level 21,

24  using the same loss amount, but the cross-reference to

25  blackmail in Section 2(b)(3.3) that starts with a base

1    Offense Level of 9 rather than 7.

2         In the memo today, Probation also comes out at

3    18-1 with guidelines of 27 to 33 months by a different

4    method.  They continue to use the cross-reference, but

5    they find it's impermissible to count the $300,000 that

6    was the subject of the last demand, but is not the

7    subject of either of the counts.

8         As I said, I'm prepared to accept what the parties

9    and Probation have found, that the guideline range is 27

10   to 33 months.  It's an 18-1.  But as I said earlier,

11   given the nature of this case, even if it -- the

12   guideline range is 33 to 41 months, um, that may not be

13   material.  Either your agreed-upon sentence is within

14   the range of reason or it isn't.  But since the parties

15   and Probation are in agreement, I accept that the Total

16   Offense Level is 18, the Criminal History Category is

17   1.  Therefore, the Advisory Guideline Range is 27 to 33

18   months in prison, 24 to 36 months supervised release, a

19   fine range of $6,000 to 4 million dollars, restitution

20   of $280,000, which I understand the -- and a special

21   assessment of $200.

22        I'm told by Probation that the victim has waived

23   his right to restitution and in that circumstance any

24   order of restitution will be directed to the Crime

25   Victim Fund under 3664G(2).  However, I say that in part

1    at this time because if Mr. Stern, on behalf of the

2    victim, has a different view as to where the restitution

3    should go, I need to be told.

4        All right.  Do the parties agree that I've just

5    accurately recited the guideline ranges?

6            MR. DOWDEN:  Yes, your Honor.

7            MR. SMITH:  Yes, your Honor.

8            THE COURT:  All right.  Mr. Stern, is there

9    something you now would like to say on behalf of the

10    victim?

11           MR. STERN:  Yes.  Thank you, your Honor.

12       And just to address the last point first.  As your

13    Honor pointed out, there is a provision in the

14    Restitution Act which contemplates the victim waiving

15    whatever rights the victim has to restitution and those

16    funds, to the extent that they are funds down the road,

17    be provided to the Crime Victims Fund.  And so the

18    victim is prepared to -- he would like that to be the

19    case.

20           THE COURT:  Okay.

21           MR. STERN:  Your Honor just to make a brief

22    statement on behalf of my client.

23       Clearly he made some very bad decisions along the

24    way.  He very much regrets that.  He regrets it on many,

25    many different -- in many, many different ways.  He

1    regrets in taking the time of the Court.  He regrets the

2    resources that have been used by the Government to

3    investigate and prosecute this case.  And, in fact, he

4    regrets that Miss Robinson is now a defendant before the

5    court.

6        But having in mind all the circumstances -- and I

7    should say, by the way, that he appreciates the efforts

8    of all involved in coming to this plea agreement, the

9    efforts on the part of the Government to promptly and

10   thoroughly investigate this case.  It was candidly at my

11   urging, when he came to me, that I thought the only

12   course of action that was responsible and appropriate

13   was to bring this to the attention of law enforcement

14   authorities.  But both the Government and defense

15   counsel, I think, have engaged in good faith discussions

16   and reached, I think, a reasonable resolution.

17       It's as your Honor alluded to, it may not be

18   perfect, and it may not be the one that the Court

19   independently, absent the plea agreement being

20   presented, might have arrived at at its own, but I think

21   it's a resolution which takes account of the particular

22   circumstances of the case, one which seeks to avoid the

23   very result threatened by the crime that's been charged

24   and now it's the one which the defendant plead guilty.

25   As the Court noted in an earlier opinion in this case,

1    that's the very harm that the prosecution seeks to

2    punish here.  And it also takes account of the fact that

3    the Court and the criminal justice system ought to be

4    avoiding harm to victims where it's reasonable to do so

5    and where it's possible.

6         You know, I've been doing this long enough, and I

7    know your Honor has, to remember that there was a time

8    that the Government and the courts, for that matter,

9    really didn't care what victims thought, really didn't

10   care the position that victims had.  And I'm pleased to

11   say that actually this district, the District of

12   Massachusetts and the Commonwealth of Massachusetts, the

13   state courts, have really been in the forefront of

14   protecting the rights of victims for 20, 25, 30 years.

15        So the crime -- the victims Rights Act really was

16   not, in my view, directed to the District of

17   Massachusetts or to a sister judicial system on the

18   state side, because I think that this system and the

19   Commonwealth have been doing this for a long time.  But

20   when Congress passed the bill in 2006, it was designed

21   to really send a message nationwide that the rights of

22   the victim, including the privacy, legitimate privacy

23   rights of the victim, do matter.  So victims do have

24   rights and they're not just, as your Honor noted in your

25   opinion, they're not just aspirational rights, they're

1    real rights, and they're designed to protect the dignity

2    and privacy.

3            THE COURT:  Well, they almost became

4    constitutional rights.  Until recently I served on the

5    National Advisory Committee on criminal rules, which had

6    the responsibility of implementing the Crime Victim

7    Rights Act resulting in Rule 60, which isn't even yet in

8    our books.  But there is a very strong nationwide

9    movement to give considerably more protection to victims

10   including, as you say, their privacy in appropriate

11   circumstances.  And there was a serious effort to get

12   Congress to vote a constitutional amendment that would

13   enshrine those interests, protection for those interests

14   in the Constitution.

15       But instead of proceeding in that fashion,

16   Congress passed the Crime Victims Rights Act, you know,

17   which is part of the reason you get to speak here

18   today.  But, you know, it is a law that, you know,

19   reflects the perception that, particularly at

20   sentencing, but not just at sentencing, it shouldn't

21   just be the Government and the defendant who are

22   considered, but if there's a victim, an identifiable

23   victim, that person's interests should be considered and

24   he, individually or through a representative, is

25   entitled to have a voice so the judge can make a more

 1    fully informed decision.

 2            MR. STERN:  And I think, in this case, your

 3    Honor, and I'll conclude on this, I do think this

 4    strikes the right balance.  Again, it's not perfect, but

 5    it does -- as the Government has pointed out, I think it

 6    does send a deterrent message.  I think it does

 7    encourage other persons in positions like this who, for

 8    whatever reason, including some bad decision on their

 9    part, to come forward to appropriate authorities if need

10    be.  And I think it also provides with a significant

11    period of supervised release, you know, some real

12    services to the defendant.  And I sincerely hope that

13    the Probation Department is in a position to provide

14    those services.

15            THE COURT:  Well, they're in a position to

16    provide them.  What you should sincerely hope is that

17    she's smart enough to take advantage of it if I accept

18    this sentence.  Okay.  Thank you, very much.

19            MR. STERN:  Thank you, your Honor.

20            THE COURT:  All right.  The Government should

21    remind me, although I think I have it vividly in mind,

22    the sentence it advocates and particularly why it

23    regards it as reasonable.  And I have some -- the

24    written submission was very helpful.  It's what I

25    usually get in a more familiar case and I certainly

1   wanted it in this case.  But I actually have perhaps two

2   related points that haven't been addressed by anybody

3   and I'll raise them at the appropriate time.

4   Mr. Dowden.

5           MR. DOWDEN:  Thank you, your Honor.  At the

6   outset, I'd like to remind the Court that the

7   Government's recommendation includes a 6-month period of

8   incarceration, a 6-month period of home detention, a

9   3-year period of supervised release, during which time

10  she may not publicize or tell anyone the name of the

11  victim, as the Court has explained, the mandatory

12  restitution as required in the Crime Victims Rights Act,

13  which I understand the victim is assigning to the Crime

14  Victims Fund, and a $200 special assessment.  And the

15  Government is not seeking a fine in this case.

16      Your Honor, as the Government outlined in its

17  sentencing memo, the totality of the components of the

18  Government's sentence is reasonable.  It is reasonable

19  because it is sufficient, but not greater than necessary

20  to effectuate the purposes of sentencing with respect to

21  this particular defendant and the offense in which she

22  engaged.

23      To be sure, as we mentioned in our memo, the

24  incarcerated period of time of this sentence is low.  It

25  is low.  And candidly the Court knows the Government

 1    usually recommends sentences that are higher.  But it

 2    has in the past and will continue to argue, in some

 3    cases, that there should be a variance.  And the

 4    Government believes the totality of the confinement

 5    period in this case, that is, 12 months, 6 months

 6    incarceration, 6 months home detention, when combined

 7    with the extended period of supervised release, is

 8    reasonable.  And the Government has a number of

 9    reasons.

10         The first is, the core of Ms. Robinson's conduct

11    is the extortion and threat here.  And Congress -- the

12    extortion and threat to injure the reputation of this

13    victim.

14              THE COURT:  Well, you say, in the indictment,

15    his business as well.

16              MR. DOWDEN:  His business as well, your

17    Honor.

18         The Government did not charge Hobbs Act extortion

19    in this case.  The government --

20              THE COURT:  And, in fact, I studied with the

21    Probation Department whether that charge would have

22    enhanced the sentence, and the guidelines would have

23    been the same.  But so I didn't raise the issue with you

24    why it wasn't a Hobbs Act extortion, because I think it

25    could have been.

1          MR. DOWDEN:  Your Honor, besides the

2     Government's charging decision with respect to Hobbs Act

3     extortion, the Government believes that the charger did

4     choose, which specifically referenced the reputation of

5     this victim, is what goes to the core of his conduct.

6     And Congress has made a determination with respect to

7     that specific conduct that a two-year statutory maximum

8     is the appropriate sentence.  Although the guidelines

9     may be higher, Congress has made a determination that 24

10    months is sufficient.

11         And I think the Court has to look at this conduct

12    along a continuum within that range.  There is no threat

13    of violence here, although it was serious conduct, and

14    repeated conduct --

15         THE COURT:  Well, you know, in blackmail,

16    usually there is no threat of violence.  This -- well,

17    go ahead.

18         MR. DOWDEN:  Yes.

19         THE COURT:  But, I mean, this is blackmail.

20    This isn't, you know, "I'm going to break your leg if

21    you don't pay your debt," but it's threatening a kind of

22    pain that can be greater than a broken leg.  Well, go

23    ahead.

24         MR. DOWDEN:  The Government recognizes that,

25    your Honor.  But the Government also believes that the

1    3-year period of supervised release in this sentence,

2    which is at the maximum of -- I'm sorry, your Honor.

3            THE COURT:  Go ahead.

4            MR. DOWDEN:  The 3-year period of supervised

5    release, when taken in connection with those other

6    components, makes this sentence reasonable.  That is a

7    significant restriction.

8            THE COURT:  Well, let me ask you this

9    something before you get to that, which is an argument I

10   think I understand.

11       But what you haven't addressed is the following

12   and that is, you know, what's the evidence of whether or

13   not Miss Robinson was the mastermind of this

14   extortionate scheme and where did the money go?  Because

15   she got $280,000 at the end of July, she was arrested

16   three years later, and she comes before me representing

17   that she's indigent.  I know that there's been the --

18   there's been interest in the missing man here, but I'm

19   not sure that the most important missing man is the

20   victim.

21       There are men -- well, there's one man mentioned

22   in the presentence report as her pimp.  It's ambiguous

23   as to whether he was the pimp until 2006 or remained the

24   pimp until August of 2008.  That's the ambiguity that's

25   created by Paragraph 69 and 95, and not until I got your

1    financial statement at about 11:30 this morning did I
2    see that in the weeks after she got this money from the
3    victim, she gave substantial amounts to two other
4    males.  And I think it's highly relevant to whether I'm
5    going to accept this sentence.  So I want to put you
6    both on notice, so you can address it.
7        Either she still has this -- a meaningful amount
8    of that money, in which case, you know, she lied to get
9    a CJA counsel and this sentence is unreasonable, or she
10   was acting at least in concert with and arguably at the
11   direction of somebody else.  And if she was acting at
12   the direct of somebody else, I think the Government has
13   got a responsibility to find out who else and prosecute
14   the more culpable person.
15       But this gives her, not a pass, but a diminished
16   role in the offense because an abused woman working as a
17   prostitute at the behest of a man, perhaps a pimp, um,
18   you know, might reasonably be regarded as less culpable
19   than somebody who's a free agent and cooking up this
20   scheme, executing this scheme on her own.
21           MR. DOWDEN:  Yes, your Honor.  And the
22   Government certainly factored that decision -- factored
23   it in in agreeing to this plea agreement.
24           THE COURT:  Well, why didn't you tell me --
25           MR. DOWDEN:  The defendant should not benefit,

1    clearly, from $280,000 that was paid in this case.  And

2    without commenting on ongoing investigative efforts, the

3    Government has an interest in making sure that there is

4    not an organized effort here and that there are no other

5    defendants here at this point.  The Government is --

6            THE COURT:  Well, is there an ongoing

7    investigation?

8            MR. DOWDEN:  Your Honor, we normally don't

9    comment on that for several important reasons, important

10   reasons that individuals who might think that we may be

11   coming will wait for us.  And so we don't wish to

12   comment on that at this point.

13           THE COURT:  Well, I still have the question

14   that I asked you.  Is it the Government's view that she

15   was the mastermind and, you know, intended sole

16   beneficiary of this scheme?

17           MR. DOWDEN:  Your Honor, the evidence that's

18   been developed to date suggests that there was not a

19   coordinated effort between Miss Robinson and other

20   individuals to execute this scheme.  The Government has

21   made efforts, frankly, to find the money in this case.

22           THE COURT:  Did you go to the safe deposit

23   box?

24           MR. DOWDEN:  Your Honor, there was a search

25   warrant that was executed on this safe deposit box

1    earlier in this year.

2              THE COURT:  And -- I'm not going to mention

3    these names of these people for a combination of

4    reasons, but if you go to Paragraph 52 of the financial

5    statement you gave me this morning that's under seal?

6              MR. DOWDEN:  Yes.

7              THE COURT:  There's somebody that had been

8    identified, "apparent business," last name "unknown,"

9    who allegedly or reportedly got $20,000?

10             MR. DOWDEN:  Your Honor, frankly, without

11   commenting on personal and private information, the

12   Government understands what the purpose of that was.  It

13   was an expense for Miss Robinson's personal benefit.  It

14   was not another individual.

15             THE COURT:  And what about on the next page,

16   the $40,000?

17             MR. DOWDEN:  Your Honor, the Government has

18   and continues to follow that lead.

19             THE COURT:  Because -- and then if you go up

20   to 49, some of the money was said to have been spent on

21   a friend's Land Rover.  Wasn't she in a Land Rover when

22   she was arrested?

23             MR. DOWDEN:  Yes, your Honor, she was.

24             THE COURT:  And so this is $13,000 for custom

25   rims on two cars, a BMW and a Land Rover.  My children

1   would tell me she was pimping their wheels, my law

2   clerks tell me that.  Do you know who the friend is?

3           MR. DOWDEN:  Your Honor, we're in the process

4   of identifying the registration for that vehicle and the

5   owners of that vehicle, yes.

6           THE COURT:  Well, if she was contrite, she

7   could voluntarily tell you who the friend is and if

8   she's not contrite, you could stick her in the grand

9   jury you can ask her when she's sentenced.  These things

10  are ascertainable.

11      Because to me, this really goes to the

12  reasonableness of the sentence.  If, you know, if she's

13  a person who was abused from childhood and now is on the

14  -- under the influence of some men who are taking

15  advantage of her, you know, that might cause the agreed-

16  upon sentence to be reasonable or reinforce the

17  reasonableness.  You know, on the other hand, if she

18  cooked up this scheme on her own and enthusiastically

19  executed it, maybe the sentence is not enough.  And, you

20  know, you say you thought about it, but there's no

21  mention of this in the submissions made.

22          MR. DOWDEN:  Because of the personal nature of

23  some of these issues, the fact that some of these items

24  that are listed in the financial statement were for her

25  personal benefit, the fact that also some of these

1    items, quite frankly, there is evidence to suggest were

2    frankly stolen from her.

3            Your Honor, would you like me to continue or --

4                THE COURT:  Okay.  Go ahead.

5                MR. DOWDEN:  Your Honor, I will not go on at

6    great length because I believe Mr. Stern has gone on at

7    great length about the victim consideration in this

8    case, and we said in our memo, that is not indeed

9    significant, impacting significant consideration for the

10   Government's calculation.  The Government has statutory

11   obligations in this matter to respect the dignity, the

12   privacy of the victim as well as to prevent further harm

13   to that victim from the defendant.  That goes to the

14   heart of the restriction that has been placed on her on

15   supervised release.

16           Your Honor, referring to deterrence, the

17   government takes that message very, very seriously.  And

18   as we outlined in our memo, the general deterrence of

19   this message in this sentence is very important.

20   Extortion preys on fear and preys on fear for

21   individuals, fear for their families, and in too many

22   cases victims succumb to that fear, pay that money, or,

23   in fact, go to self-help and the Government does not

24   want to promote that.  And it's sending a message that

25   the Government takes extortion seriously, takes the

1    victim's rights not to have the very fear that was

2    supposed to be caused on them come to fruition, very

3    seriously.  Thank you.

4            THE COURT:  Well, I just want to make sure

5    that I'm clear.  I asked you whether you thought she was

6    acting alone and was the mastermind of this scheme or

7    whether, I mean, there's an escort service whose name

8    you have.  It's in here.  Do you know who the escort

9    service is?

10           MR. DOWDEN:  Your Honor --

11           THE COURT:  I'm not asking you to tell me.

12   I'm just asking you if you know?

13           MR. DOWDEN:  Your Honor, there does not

14   appear, based on what we know today, that the escort

15   service was significantly involved in the execution of

16   this scheme.  There may have been another individual who

17   was involved in this scheme.  And that, without

18   commenting any further, is subject to inquiry.

19           THE COURT:  "May have been."  Well, Miss

20   Robinson knows.

21           And just to make sure I've got this clearly in

22   mind, I think -- it's not part of the sentence, but the

23   ancillary order or the agreement of the Government is

24   going to require that the U.S. Attorney's Office collect

25   in writing the names of everyone who -- employed by the

1    Government who knows the victim's identity.

2    Mr. Levenson can hold that for the Government.  I'll

3    issue an order that everybody on that list use -- you

4    know, to maintain the confidentiality of it and only use

5    it in connection with his or her responsibilities in

6    this case or any investigation arising out of this

7    case.  And hopefully I'll never have to look at that

8    list if I impose the sentence.  Okay?

9             MR. DOWDEN:  Your Honor, just two other

10   points.  Just the mechanics of that, your Honor, and

11   I'll let my colleague address that in more detail.

12            THE COURT:  We'll deal with that later.  If I

13   issue an order and you want it refined in some way, you

14   can ask me and I'll seriously consider it.

15            MR. DOWDEN:  To the extent that there are

16   individuals associated with the defendant, that would be

17   separately filed with the Court, their submission, I

18   understand, your Honor?

19            THE COURT:  I guess I'll take that up with

20   Mr. Smith, whether he'll hold it or file it with me.  I

21   might just rely on him to hold it.

22        All right.  Mr. Smith, what you filed this morning

23   was helpful, too, but you now know I -- as I say, I

24   think the -- I don't know whether there's a missing

25   person here that would give me a more accurate

1  perspective whether -- well, of your client's role in

2  the offense and whether this sentence is reasonable.

3          MR. SMITH:  Well, I'll address it.  I believe

4  the sentence is reasonable, your Honor, and we agree

5  with the Government that the guidelines don't really

6  fully address my client's individual situation, that a

7  variance is appropriate, and a sufficient sentence is

8  what's been recommended by the parties.

9          And obviously if we turn to the 3553A factors,

10  which we've outlined in our brief, we start with my

11  client's background, which you're now familiar with,

12  with the PSR, as a child.  She was raised by parents

13  that both battled substance abuse problems and she faced

14  significant physical abuse in the home.  As a result,

15  twice in her young childhood she was removed from the

16  home by state authorities.  She returned to the home as

17  a child only then to endure homelessness with her

18  family.  And as a result she suffered from dire

19  financial and economic circumstances resulting in her

20  turning to prostitution as a teenager.  And as it was

21  found out through the PSR, she disclosed to the

22  Probation Officer, that at 15 was her first exposure and

23  experience in that.

24          THE COURT:  Could you take the microphone and

25  speak into it, please.

1           MR. SMITH:  Yes, your Honor.

2           (Gets microphone.)

3           MR. SMITH:  As I was saying, at 15, my client,

4    she ran away from home, she did enter into the world of

5    prostitution for a period of her time.  She was able to

6    extricate herself only to find herself at the age of 20

7    as a single mother with a young child whose husband was

8    gone.  And, again, then, at that point in time, she

9    turned back to prostitution, which has been,

10   unfortunately, really a terrible concept as a result of

11   the dire circumstances that she found herself growing up

12   in.

13        Obviously she engaged in illegal conduct.

14   Obviously she had to support her child.  She did the

15   best she possibly could, your Honor.  And until the

16   circumstance leading up to this arrest, she had not been

17   convicted of a crime and she had not been incarcerated.

18   And she hadn't served any time until about the 13th of

19   August when she was arrested.

20        And I think, your Honor, to address the deterrent

21   effect, um, we did some research to look into for the

22   Court to see if there are similar cases and we found

23   none in Massachusetts.  And my client, should the Court

24   impose this sentence, will have spent one year in

25   incarceration, essentially.  She'll have lost her home,

1    she'll have lost custody of her daughter, which is now

2    in temporary custody of a relative.  She's lost

3    everything she's owned.  And the equivalent of economic

4    capital punishment comes to mind when you realize, yes,

5    she is a young mother, she was struggling, she made a

6    mistake, she acknowledged her mistake, she came forward

7    and filled out a financial --

8              THE COURT:  She didn't just quite make a

9    mistake, she committed a very serious crime.  I mean,

10   extortion has long been regarded as a serious crime.

11   Not every prostitute resorts to extortion.

12             MR. SMITH:  We agree with the Court on that,

13   this is a very serious crime, your Honor, and she

14   acknowledged and accepted the responsibility, and she's

15   lost virtually everything she's had.  She didn't have

16   much, but she's lost virtually everything she's had as a

17   result of her acceptance of the responsibility.

18        Clearly she stands as a deterrent effect on

19   anybody else who might consider this kind of conduct.

20   Clearly she's been punished by serving a year in jail,

21   having three years of supervised release, where she's

22   going to have to report and live by all the rules

23   imposed by the court.

24        Also, there's a rehabilitative possibility by

25   following the rules laid down by the Probation Officer

1    in supervised release, there's a possibility she could

2    obtain some kind of occupational training and be

3    rehabilitated, your Honor.  She's only 27 years old.

4    She has a very young child.

5        I mean, for all these reasons, that the sentence

6    imposed by the Court is sufficient but not greater than

7    necessary.

8             THE COURT:  Well, I guess I have a series of

9    related questions.  As I said, if you look at the

10   presentence report, there's an ambiguity.  Take a look

11   at Paragraph 69 and 95.  69 suggests that she hadn't

12   identified the person as a pimp until 2006 and --

13            MR. SMITH:  Your Honor, could we approach for

14   a moment on that particular point?

15            THE COURT:  We can.  And, in fact, you know,

16   if there's anything I should be told in the lobby or at

17   the side bar, that's fine.  You know, some of this could

18   affect an ongoing investigation, if there is one, some

19   of this could affect his privacy interests, but it's

20   also related to the decision I need to make and it

21   shouldn't be discussed in open court.  So we'll have a

22   brief closure of the court.  But I'll see you at side

23   bar.

24

25

```
 1                (In open court.)
 2                THE COURT:  All right.  Mr. Smith, let me do
 3      the following.  If I accept this plea agreement, am I
 4      correct in understanding that it's consistent with the
 5      plea agreement to make the home detention on electronic
 6      monitoring?
 7                MR. SMITH:  Yes, it is, your Honor.
 8                THE COURT:  And it will probably take at least
 9      a day and maybe a little more to set that up, if there's
10      an operative telephone at the location that you propose
11      she reside.  Do you know whether there is yet an
12      operative telephone?
13                MR. SMITH:  There is.  I have the phone number
14      right here, your Honor.
15                THE COURT:  Well, you'll give it to Probation
16      if I accept the sentence, but it would require the
17      preparation of a judgment.  As a practical matter, Miss
18      Robinson wouldn't get out until next week and until that
19      place, that phone can be dealt with.  Is that consistent
20      with the agreement?  Because I can also continue the
21      sentencing.
22                MR. SMITH:  No, I think we would be willing to
23      agree to whatever the Court -- if the Court were going
24      to impose a sentence, we would agree to those
25      conditions, your Honor.
```

1          THE COURT:  Well, is there any more that you

2    would like to say?

3          MR. SMITH:  No, your Honor.  Thank you for

4    your courtesy.  And I would like to thank Probation for

5    promptly completing the PSR in a way that could expedite

6    the sentencing proceeding today.

7          THE COURT:  They worked very hard and did very

8    well.

9       Miss Robinson, you know have an opportunity, but

10   not an obligation to speak before I decide whether to

11   accept this sentence, and I haven't decided yet.  But

12   that means you don't have to say anything, if you don't

13   want to, but if there's something you would like to say,

14   for me to consider, now is the time.

15          THE DEFENDANT:  Um, I just want to apologize

16   to the Court and to the victim, that I feel really

17   horrible.

18          THE COURT:  I'm sorry.  I can't hear you.

19          THE DEFENDANT:  I just want to apologize to

20   the Court and to the victim.  I feel really horrible and

21   I'm really sorry for what I did.  And I have no

22   intentions of discussing this case with anybody.

23          THE COURT:  Okay.  You may be seated.

24       I'm going to take about a 10-minute break and then

25   I will return and tell you whether I'm accepting the

1    plea agreement.  The Court is in recess.

2                    (Recess 4:20 p.m.)

3                    (Resume 4:35 p.m.)

4            THE COURT:  Having had the opportunity to

5    consider this matter intensely and carefully and for the

6    reasons I'll describe, I do hereby accept the binding

7    plea agreement.  Count 1 of the indictment in the

8    information is therefore dismissed.

9            I find that the agreed sentence is reasonable.  It

10    is the result of arm's length negotiation by capable,

11    experienced counsel.  It is within the range of reason

12    when all of the Section 3553A and B factors are

13    considered.

14            I think even before **Booker**, this could have

15    properly been viewed as a justified departure.  The

16    agreed-upon sentence requires that Miss Robinson spend a

17    year in custody, 6 months in jail, already served, and 6

18    months in home confinement.  The sentencing guideline

19    expressly recognizes that in certain circumstances a day

20    in home confinement can be properly exchanged for a day

21    in jail or prison.

22            This sentence, agreed upon by the parties, is 15

23    months below the bottom of the Advisory Guideline range,

24    however, this case is not in the heartland of cases

25    considered by the Sentencing Commission in developing

1    the guidelines.  Consideration of the Section 3553A

2    factors, as I'll explain, persuades me that this

3    sentence is sufficient and no more than necessary to

4    serve the statutory goals of sentencing.

5        I have, as required by the statute, considered the

6    nature and circumstances of the offense.  It shouldn't

7    be lost that extortion is a very serious crime, a crime

8    that would ordinarily be properly punished by a

9    considerably higher sentence than the sentence imposed

10   today.  However -- although nobody, particularly Miss

11   Robinson, wants to say so, I infer that she was not a

12   totally free agent in this matter.

13       She has a history of being an abused woman.  She

14   first became a prostitute when she was 15.  She is a

15   person with a history of being taken advantage of by men

16   who profited from her prostitution.  I infer that she's

17   not the only person morally culpable in this case, in

18   this crime, and perhaps, although further investigation

19   will be necessary to say with certainty, she's less

20   culpable than others who -- or at least one other,

21   involved in the extortion.  I'm not talking about the

22   victim, I'm talking about one or more other individuals.

23       As required by Section 3553A, I've considered

24   Ms. Robinson's characteristics.  As I said, she had a

25   difficult life.  She's been abused.  She's been

1    homeless.  But she's also made a number of efforts to

2    get an education.  And she's lost the custody of her

3    daughter as a result of this.  She tried to go to

4    college and the fact that her boyfriend was storing

5    marijuana in her dorm room got her thrown out of

6    college.  It seems to be part of a pattern.

7        I find that the one year in custody adequately

8    reflects the seriousness of the offense.  It should send

9    the message to Miss Robinson to stop committing crimes,

10   including prostitution.  If you engage in prostitution,

11   it's a violation of state law, it's a violation of your

12   conditions of supervised release, you can be locked up

13   again for 3 years, in this case, if you return to

14   prostitution.  But you should particularly avoid even

15   more serious crimes like extortion.  You're going to get

16   caught, you're going to get convicted, and you're going

17   to get even more seriously punished.

18       I also think that this sentence, which involves a

19   year in custody, should send the message to others that

20   they should resist any temptation to extort money.

21       The Crime Victims Reform Act, as I said earlier,

22   is a relatively recently enacted statute.  It requires

23   that victims' dignity and privacy be respected.  The

24   plea agreement that I've accepted eliminates the need

25   for a trial that would have inevitably disclosed the

1    identity of the victim of the extortion.  That

2    disclosure is precisely the harm that Miss Robinson was

3    threatening to inflict on the victim.

4         In hiring a prostitute, which itself was illegal,

5    the victim assumed the risk that he might be caught in

6    an investigation of prostitution and his illegal conduct

7    might have been lawfully disclosed by law enforcement.

8    However, engaging a prostitute or by engaging a

9    prostitute, he didn't authorize or justify the extortion

10   that occurred here.

11        While that business person created his own

12   vulnerability, he is nevertheless a victim and he has a

13   right recognized by that statute, the Crime Victims

14   Rights Act, to have his privacy interest given weight in

15   this case.

16        As the Government argues, the sentence I will be

17   imposing punishes the defendant while maintaining the

18   confidentiality of the victim and therefore should have

19   the effect of deterring extortion by prostitutes and

20   others and if necessary promote the likelihood that

21   they'll be caught and convicted by encouraging other

22   victims to inform law enforcement when extortion has

23   occurred.  This is in the public interest.

24        The sentence will also give the defendant a chance

25   for a healthier and safer life.  When you get out, you

1    won't be alone.  The Probation Department will be your

2    partner.  They will help you get treatment for any

3    mental health or drug addiction problems you may have.

4    They will help you get an education, which at various

5    times, you've tried to get.  They'll help you find a

6    job.  They'll help you find a way to live a life where

7    you don't have to work as a prostitute.

8         And if you're in danger from anybody else, you

9    should tell your Probation Officer and your lawyer and

10   they'll help protect you from that danger.  You can get

11   restraining orders, you can get anybody who is menacing

12   to you illegally prosecuted.

13        I find that the sentence agreed upon and being

14   imposed will not cause unwarranted disparity.  As I

15   said, Miss Robinson's case is not in the heartland of

16   wire frauds or extortions.  It doesn't fit the paradigm

17   the Sentencing Commission had in mind when it generated

18   the guidelines.  It is a different sentence, but it's a

19   justified different sentence than the guidelines

20   contemplated.

21        So I find that one year in custody and the

22   requirement that Miss Robinson, while on supervised

23   release, not disclose the name of the victim to anybody,

24   constitutes a reasonable sentence and I will impose it.

25        But as I'll explain, if she violates any of the

 1    conditions of her supervised release, including by
 2    disclosing the identity of the victim in this case, she
 3    should expect to be brought back in front of me, have
 4    her supervised release revoked, be locked up for up to 3
 5    years, and then be placed on supervised release again,
 6    where if she violates any of the conditions, she's going
 7    to be locked up for that full period of supervised
 8    release, too.
 9         Miss Robinson, please stand.
10              (Defendant stands.)
11         THE COURT:  In connection with the two counts
12    to which you've plead guilty, I hereby sentence you to
13    time served, plus 5 days, which is consistent -- which
14    means you're going to be released next Wednesday and
15    possibly sooner.  But it's essential that Probation
16    determine that you have a suitable place to live and
17    that the electronic monitoring be set up.
18         So basically, to articulate it this way, I'm
19    accepting the binding plea agreement, effective February
20    25, 2009, because by that time I will have signed a
21    judgment that will permit the Federal officials to
22    release you and you'll have in writing what you have to
23    do.
24         I'm imposing a term of 3 years supervised release,
25    the first 6 months on electronic in-home detention on

electronic monitoring.  That means you'll be allowed to
leave only when Probation permits it.  And if it turns
out that you obey the conditions and you're in school or
have other responsibilities, Probation can come back to
me and ask me to take the electronic monitor off.  But
basically you're only going to be able to go out when
Probation permits you to go out on those 6 months.
You're to be home, except when authorized by Probation,
or for a true medical emergency.

As a condition of your supervised release, you may
not disclose the name of the victim in this case to
anybody except your attorney and those working with them
in connection with this case.  They may use that
information solely for the purpose of this case.

I'm ordering that by February 25th, Mr. Smith get
from you the name -- in writing, the name of every
person, to your knowledge, who knows the name of the
victim in this case.  And he's to file an affidavit
stating that he has that list and that he'll keep it
until at least your supervised release has ended.

Your supervised release is also on the following
conditions.  There are standard conditions.  You can't
commit another Federal, state or local crime.  You may
not unlawfully use a controlled substance, that is, a
controlled substance without a prescription.  You can be

 1    tested up to 104 times a year to see if you're using

 2    drugs.  You shall participate in any mental health or

 3    drug treatment program prescribed by Probation.  And if

 4    you have the money or insurance, you have to pay or

 5    contribute to the cost of that.  You have to submit to

 6    the collection of a DNA sample.  You may not possess a

 7    firearm or other dangerous weapon.

 8         I'm not imposing a fine because there's no fine

 9    cited for in the plea agreement.  However, there is a

10    mandatory $200 special assessment.  As far as I know,

11    the forfeiture prescribed by Paragraph 9 of the plea

12    agreement is in effect, it's part of the sentence, and

13    you have to forfeit the property as stated in the plea

14    agreement.  So if you have any more of that money that

15    you extorted, it has to be returned.

16         To some extent I've already explained the -- I'm

17    sorry.  There's restitution of $280,000 that shall be

18    made to the Crime Victims Fund pursuant to 18 United

19    States Code, Section 3664G(2), because the victim has

20    waived his right to get his money back.  And under your

21    plea agreement, since I've imposed the agreed-upon

22    sentence, you have waived your rights to appeal or

23    collaterally challenge this decision, except if there's

24    some favorable decisions to you which have retroactive

25    effect.

1       Essentially the reasons for this sentence, as I
2   said, were described earlier, but they're as follows.
3   What shouldn't be lost here is you committed a very
4   serious crime and it could have resulted in your going
5   to prison for years.  A sentence has to be imposed to,
6   in effect, teach you a lesson and it has to be
7   sufficient to try to teach other people who might be
8   tempted to extort money from people who put themselves
9   into jeopardy of being extorted from doing that.  But
10  the sentence also recognizes that you're still a
11  relatively young person, that you had hardship in your
12  life, that there have been times when people have taken
13  advantage of you, and this may be one of them, and that
14  there's hope for you, if you take advantage of this
15  opportunity.
16      Right now you probably feel that this case has
17  been a really miserable experience and I'm sure that it
18  has.  I expect that losing custody of your child has
19  been painful, among other things.  But if you're -- if
20  you've learned anything from all of this, this case
21  could turn out to be the best thing that ever happened
22  to you, because you were living a miserable life.  You
23  were going to get into trouble, if you didn't get
24  killed, or seriously hurt, the way you were going.
25      And as I said earlier, I was struck when I read

1    the presentence report and saw all of the efforts that

2    you had initiated at various times to get an education,

3    because I know a lot of people with your background

4    don't do that or can't do that.  But if that's still of

5    interest to you, this case is going to have broken your

6    connection with that miserable past, given you a partner

7    in the Probation Department that will help you get on a

8    path towards a lawful, productive, happier future.  It's

9    ultimately up to you.

10            You don't want to see me again, because if you're

11   back here, you're probably just stopping in the

12   courthouse on your way to prison for 3 years.  It's very

13   important to you that the victim's name not get out,

14   that you not use drugs, that you not do anything that

15   would be a violation of your conditions of supervised

16   release.  If you succeed in doing all that and you take

17   advantage of the partners you have in the Probation

18   Department, your future is going to be a lot happier

19   than your past.  But ultimately that's up to you.  You

20   may be seated.

21            (Defendant is seated.)

22            THE COURT:  This isn't part of the sentence,

23   but I think we believe we've agreed it's appropriate and

24   at the beginning of next week I'll issue something in

25   writing on this, but I am ordering the Government to

1    collect, in writing, the names of everybody employed in

2    the United States Attorney's Office, the FBI, and if

3    there's anybody else in any other office or agency, who

4    knows the victim's identity.  I'm ordering that

5    Mr. Levenson, or his successor, maintain that list.  I'm

6    ordering that the victim's identity be used by those

7    employees of the Government who have a need to know it

8    only for the purposes of this case or any investigation

9    or prosecution arising out of this case.

10         It may be that additional people will have a

11    legitimate need to know the victim's identity, but those

12    people will have to go on Mr. Levenson's list and will

13    have to understand that they're subject to this order.

14    I may issue a form that they can sign saying that

15    they've read the order and they understand that if they

16    violate it, they can be subject to criminal contempt.

17    That the Government has made serious and apparently,

18    thus far, successful efforts to meet its

19    responsibilities under the Victim Rights Act and it's

20    just very important that that effort and that success

21    continue.

22         As I said, Count 1 is dismissed and the

23    information is also dismissed.

24         Is there anything further in this matter for

25    today?

1          MR. DOWDEN:  Nothing from the Government, your

2    Honor.

3          MR. SMITH:  I would just ask if our side bar

4    conference could be sealed, your Honor?

5          THE COURT:  Yes.  If the transcript is

6    prepared, the side bar conference, pursuant to standard

7    procedures, will be transcribed separately and placed

8    under seal.

9          MR. SMITH:  Thank you.  And the other inquiry

10   we had, your Honor, is if my client were allowed to

11   regain custody of her daughter during the time of home

12   confinement, there wouldn't be any prohibition from the

13   Court of the daughter living with her at the apartment?

14         THE COURT:  No, there's no prohibition and --

15   and this is just going to have to be worked out with

16   Probation.  If she's a single person living alone, she

17   can go out with the authorization of Probation.  If

18   she's got a chance to look for education or employment,

19   I want her to do it, I don't want her to sit there for 6

20   months and then start doing it.  If she gets her

21   daughter and the requirements of taking care of her

22   daughter make the electronic monitoring not feasible, if

23   she's performed well on the electronic monitoring,

24   Probation can come back to me and ask me to take her off

25   the electronic monitoring.  The proverbial ball is in

1    her court.

2              MR. SMITH:  Thank you.  We have nothing

3    further, your Honor.

4              PROBATION OFFICER:  Excuse me, your Honor.

5    There are other -- some suggested special conditions in

6    our recommendation dealing with the collection of the

7    restitution payments.

8              THE COURT:  Okay, actually, that's a good

9    point.  I thought because there was no fine, those

10   weren't necessary, but I appreciate you bringing those

11   to my attention.

12        The restitution is to be paid on a schedule that

13   the Court will order even though there's no fine.

14   Probation will propose a schedule after they talk to

15   you.  As long as you owe any amount of restitution, you

16   may not incur any new credit charges or open any

17   additional lines of credit without the approval of the

18   Probation Office.  You must provide the Probation Office

19   access to any requested financial information, which it

20   may share with the U.S. Attorney's Office.

21        And I think that's it?

22             PROBATION OFFICER:  That's all, your Honor.

23             THE COURT:  All right.  You all did a highly

24   professional job.  It facilitates the administration of

25   justice when you do that.

1          The Court is in recess.

2               (Ends, 5:05 p.m.)

3

4               C E R T I F I C A T E

5

6     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do
hereby certify that the foregoing record is a true and
7  accurate transcription of my stenographic notes on
Friday, February 20, 2009, before Chief Judge Mark L.
8  Wolf, to the best of my skill and ability.

9

10

11 /s/ Richard H. Romanow
_____
12    RICHARD H. ROMANOW

13

14

15

16

17

18

19

20

21

22

23

24

25